**EVANS et al. v. CONTINENTAL MOTORS CORP.**

**ELY et al. v. CONTINENTAL MOTORS CORP.**

Civ. A. Nos. 6521, 6892.

United States District Court
E. D. Michigan, S. D.

June 25, 1952.

Kenney, Radom, & Rockwell, Detroit, Mich., Milton Roberts, Detroit, Mich., of counsel, for plaintiffs.

Butzel, Eaman, Long, Gust & Kennedy, Detroit, Mich., for defendant.

KOSCINSKI, District Judge.

These two cases were consolidated for trial. Plaintiffs claim compensation for overtime work for the period 1941 to 1947, liquidated damages, and attorney fees under provisions of the Fair Labor Standards Act, 29 U.S.C.A. § 216(b). Claims of plaintiffs Miller, Little, Rolby and Phillips were separated and tried first as typical of remaining plaintiffs' claims.

The principal questions involved here are, (1) The propriety of plaintiffs' classification by defendant as exempt employees, Sec. 213(a) (1) of the Act, and 541.1, 541.2 and 541.3 of the Regulations, and, (2) Defendant's good faith in so classifying them. Sec. 260 of the Act.

### Facts

Plaintiffs had been previously employed by the defendant for long periods of time until defendant's Detroit Plant was completely shut down early in 1940. When the National Defense Program got under way in the latter part of 1940, the Plant was prepared for reopening and production of tank and airplane engines under contract with the War and Navy Departments of the Government. New equipment and machinery was ordered and organization of key personnel begun. Because of their experience, knowledge and ability, based on their long previous employment with defendant, plaintiffs were re-employed on a salary basis to use their experience and skills in the organization and supervision of plant departments headed by each of them. At peak production the Plant employed 8,000 workers and their activities were supervised and coordinated by personnel appointed by Management for that purpose.

Each of the four plaintiffs had a Management classification, as distinguished from the hourly rated employees, and each was excluded from union membership by the union contract, and was by the same contract prohibited from doing the work of hourly rated employees except for instruction and demonstration purposes or in an emergency. The Union Local had its stewards posted throughout the Plant to detect violations of the contract and prevent plaintiffs and other persons identified with Management from violating this contract provision. Enforcement of this provision in the union's contract with defendant was so strict that the union, through its stewards, caused work stoppages in the Plant whenever violations of this type were discovered. Plaintiffs definitely were not "working foremen" or "working supervisors" with a nonexempt status.

As the Company's operations increased in tempo and importance, applications for permission to increase plaintiffs' salaries were made by the Company to the Salary Stabilization Unit of the Treasury Department, Washington, D. C., whose function it was to pass on the salary increases of those employed in an "Executive." "Administrative" or "Professional" capacity, as defined by Regulations issued by the Treasury Department, 1A C.C.H.Lab.Law Serv., p. 14008. These Regulations were identical with those issued by the Wage and Hour Administrator. Approval of increases in plaintiffs' salaries was made by the Treasury Department on the basis of such classification.

### Hulah Miller

Miller was originally employed as electrician by the defendant in 1928 and worked continuously until the early part of 1940 when the Detroit Plant was shut down and he was transferred to defendant's Muskegon Plant. Late in 1940 he returned from the Research Division of the Muskegon Plant to undertake the organization of the Maintenance Department of defendant's Detroit Plant, and was appointed Foreman of that Department and later Division Sup-

erintendent, responsible for complete factory maintenance. He had direct supervision of several categories of hourly rated employees in the Maintenance Department, such as electricians, pipe fitters, millwrights, carpenters, laborers, welders, elevator operators and motor oilers, with a foreman at the head of each group. Miller supervised those 200 employees in the Department, including two general foremen and seven regular foremen, all of whom were hourly rated employees. He regularly issued directions to these foremen relating to the work done by employees under them. He had his own glass-enclosed office and desks where clerical personnel assisted him in the performance of his supervisory duties of the Department, and where foremen consulted him and received orders from him.

Miller was responsible only to the top executives of the Company, whom he regularly and directly assisted in the most important duties of maintaining the entire Plant in operation. Although he did perform some manual work from time to time, it was only in an emergency or for demonstration purposes. He was not, however, assigned or directed to do any hourly rated employees' work, and whenever he did such work it was invariably done voluntarily and only as an incident to his supervisory duties. His claimed clerical work was generally related to his supervisory functions, such, for example, as making reports or recommendations following his inspection and observations, and was not work "of the same nature" as performed by the hourly rated employees whose work he directed.

Miller's initial salary was $225 per month. This was increased October 3, 1942 to $385 per month, and later increased to $425 per month, so that with the various bonuses paid to all employees, Miller's salary reached a peak of approximately $660 per month. He was the highest paid employee in the Maintenance Division.

Miller regularly interviewed applicants for jobs and made recommendations to the highest executives in the plant for the hiring and firing of hourly rated employees. These recommendations were invariably approved, as evidenced by employment records of the Company. He used his own judgment and discretion in making such recommendations, and he also exercised authority to hire and discharge employees. His recommendations for transfer of employees from one department to another and upgrading employees were regularly followed, as were his recommendations for retention or discharge of employees. It was his responsibility to determine whether or not it was necessary for hourly rated employees to work overtime. While foremen of the various groups of workers had authority to hire and fire hourly rated employees in their own category, only Miller exercised the authority inherent in his position to hire and fire hourly rated employees in the various categories described, throughout the Maintenance Department.

He was entrusted with the responsibility of estimating the cost of work orders. In this he exercised an important function of industry. He regularly used his own discretion in the purchase of materials and supplies. He made the determination of the kind, type and amount of materials to be purchased, and the source from which such materials were to be secured. When work orders were issued by the Plant Engineer's office they were transmitted to Miller who used his discretion in apportioning the work to the various foremen in the Maintenance Department, following his determination of the cost of each job as approved by the executive whom he assisted. He regularly participated in meetings and conferences with the highest executives and Company officials relating to policy, methods of work and formulating job programs. He also held regular meetings with the foremen under his supervision, as well as conferences with the Plant Engineer, Production Manager, Planning Manager and other high officers of the defendant Company, so that those whom he supervised would conform to Management policies.

There was a variety of important tasks to be performed by hourly rated employees throughout the Plant and Miller's responsibility was to check and supervise the work performance by such employees. He obtained reports from his foremen and submitted reports based on such data to the executives to whom he regularly reported,

and made recommendations based on such collected information and his own observations.

In checking the progress of work orders in the Plant, reporting short-comings and recommending improvements, he was regularly assisting a bona fide executive or administrative employee in nonmanual work and exercising discretion and independent judgment. When his work day came to an end, he generally left directions for the foremen on the second and third shifts. To a considerable extent, the operation of the whole Plant depended largely on Miller's capacity, experience, knowledge, discretion and judgment.

It is abundantly clear that the top officials of the Company shared their responsibilities with Miller and that he regularly and directly assisted them in nonmanual work, also, that his duties necessitated the continual exercise of discretion and independent judgment by him. When it is considered that the defendant's Plant employed up to 8,000 workers at its peak, it is readily understandable that the Plant's chief executives would necessarily have to rely for such assistance on men such as Miller, whose experience, knowledge and judgment peculiarly fitted them for supervision work and assisting high Plant officials in the performance of important and responsible tasks relating to the operation of the Plant.

When government contracts were being terminated, Miller continued in defendant's employ as Foreman of Carpenters working in the Maintenance Department at a salary of over $400 a month. When he became Carpenter Foreman, a recognized subdivision of the Maintenance Department, from October 16, 1945 to March 27, 1947, he was regularly directing the work of a group of ten to fifteen carpenters and doing none of their work himself in moving and crating machinery in which activity he used his own judgment and discretion. Now, as before, his duty was to concern himself with having the work done properly in order to pass the scrutiny of government inspectors. It was his responsibility to obtain the necessary materials for his group of carpenters. Such materials were obtained through requisitions made out by him and

based upon his judgment and discretion as to need and quality. That this was supervisory in character is clearly recognized in the 1941 Wage and Hour Manual, 1428, 1429. "The present definition of the terms 'Executive' and 'Administrative' applies with particular aptness to persons who are commonly called 'bosses.' The range of exception is broad. It extends from the president of a large and complex corporate structure down to the foreman in charge of a very minor department." He had the authority to and did actually fire employees as evidenced by dismissal notices signed by him.

Miller's primary duty was the management of the customarily recognized Maintenance Department, and later a subdivision of it, and whatever duties of a manual nature he performed were incidental to his supervisory duties. The defendant has amply proved by a fair preponderance of all the evidence that Miller's hours of work of the same nature as that performed by the nonexempt employees did not exceed 20% of the number of hours worked in any work week by the nonexempt employees under his direction.

## George Little

Little was hired primarily to assist in increasing and accelerating production. His salary ranged from $400 to $675 per month, including bonuses. Because of his long experience in supervisory work with defendant he was placed in complete charge of the Materials Division of the Planning Department, a recognized department of defendant's Plant, and as head of this Department, he was directly responsible for movement of all materials within the Plant according to schedule. He also assisted the Production and Planning Managers, whose chief responsibilities consisted of ordering, releasing and scheduling all materials and finished parts required to manufacture the engine. Production schedules were set up and arrangements made to meet these schedules. This involved bringing into the Plant both rough materials and finished parts. Little was the representative of the Production and Planning Managers on the shop floors and regularly assisted the Production Manager in main-

taining the schedules in arranging for an orderly flow of materials and parts through the various departments of the Plant until the final assembly of some 1400 finished parts required for completion of the engine in the Assembly Department. He was classified on employee rolls as Assistant Production Manager and Supervisor of the Materials Division.

To co-ordinate the activities of the Materials Division, he supervised several subdivisions of that Department such as Bar and Rough Stock, where iron, steel and rough castings and forgings were stored until they were released for production, and Finished Stores, where the finished parts, manufactured either by Continental or others, were stored. Each of these groups had its own foreman, responsible to Little. Te expedite the movement of materials through the Plant, he was put in charge of the Hand and Power Truck Department and Carrier Box Department, and also of the Stock Chasers, a regular subdivision of the Materials Division. Little issued orders regularly to the foremen on all three shifts.

In assigning as many as 125 stock chasers on all shifts to the several departments, he customarily and regularly directed the work of the employees under him and exercised his discretion in directing the use of hand trucks or power trucks by them in the performance of their work. He conducted meetings twice a day with his foremen and also presided at other meetings in the absence of the Production Manager relating to Management policies.

Little regularly gathered information in the shop on the basis of which he estimated the number of days for which materials and parts on hand would be available and conferred with the Production Manager regarding elimination of the "bottle necks." He regularly made estimates of the delays to be encountered due to a lack of sufficient supplies on hand which in his judgment he attributed to machine breakdown or the scarcity of parts and materials and constantly transmitted his findings to his superior. This was one of the chief functions of his job. To determine what

part was particularly critical, he first went to the stock chaser whom he had assigned to the assembly department and checked his report of these highly critical items. He then prepared lists of those items, broken down according to particular groups of stock chasers to whom the hypercritical part or parts were assigned, and gave these lists to his foremen with directions to prevent shortages which would result in crippling operations.

Under the ever watchful eyes of the shop stewards there was little opportunity for him to carry parts by hand without detection, and with exceptions, there was always a sufficient number of stock chasers on hand to perform the work. Whenever he assisted the stock chasers or others in getting out the work, he did it wholly of his own volition and only in his eagerness to keep the parts moving, and not because he was directed by Management to do so. It is however established by a fair preponderance of all the evidence that his hours of work of the same nature as that performed by the nonexempt employees did not exceed 20% of the number of hours worked in any work week by the nonexempt employees under his direction.

Little was in constant communication with the Production Manager with information on the progress of the prepared schedules of work. He kept the Production Manager apprised of the actual situations existing each day as to meeting production schedules. He would talk to production line foremen to make extra efforts to keep the assembly line going. When he had apprehensions that there would be a stoppage in the assembly line, he would contact the division machine shop superintendent and take all necessary measures to expedite the assembly line.

It was one of Little's principal duties to make certain that a sufficient supply of stock was on hand at all times. He checked the supplies in Rough Stores daily and prepared lists for follow up men regarding items that had to be purchased outside from information he personally gathered, and he also made out the emergency lists in the various departments of the Plant.

He regularly made written recommendations and suggestions for increasing supervision and manpower and building up the third shift. He came up with solutions for eliminating production slow-ups and machine imperfections, hazardous and unsafe conditions in the building, and recommended changes that could be made in the production departments to increase efficiency. He instructed foremen in their work and would make recommendations for additional foremen. All these recommendations were usually approved in reliance on his judgment. He admitted that the Plant Manager depended a lot on him, and that he was the eyes and ears of the Plant Manager and the Planning Manager on the floor of the shop; also, that, "I was to write anything that I thought was to be beneficial." Little operated the whole Department under only general supervision of the Production and Plant Managers. He never had regular hours at the Plant, and himself testified that he was to overlap the second shift in order that he might obtain vital information regarding shortage of rough material.

His requests for hiring of help were approved and he hired the help. He also approved inter-departmental transfer of workers. His recommendations concerning procedures in handling of difficult situations arising in various departments were accepted and carried out. He promoted or upgraded employees and approved dismissals of employees. His authority included transferring of men from one shift to another and appointing supervisors over different shifts. He also attended joint meetings of the Muskegon and Detroit Production and Material Department heads, at which important decisions relating to his Department were made. He, of course, participated in these decisions.

In his activities he regularly and directly assisted the Planning and Production Managers who were both bona fide executive and administrative employees themselves. His assistance was nonmanual in nature and required discretion and independent judgment. His work also involved the execution under only general supervision of special nonmanual assignments and tasks directly related to Management policies and general business operations.

### George Rolby

Rolby was Quality Manager in charge of Inspection Department including Laboratory, Salvage and outside road men who were stationed in customers' plants. His primary duty consisted of the management of the Inspection Department, which is a customarily recognized department, and he customarily and regularly directed the work of all employees in his Department and its subdivisions. He supervised the inspection of all materials, whether they were fabricated in the Plant or made by outside vendors.

His initial salary was $300 per month. Within less than a year his salary was increased to $475, and he ultimately received as high as $750 per month, including the usual bonuses. He had his own office and a stenographer who handled the correspondence and clerical work in his office. Each morning he would first examine incoming mail from vendors of materials and inter-departmental memoranda. In all his correspondence with subcontractors and vendors, he invariably described himself as "Quality Manager."

Each day he went through the shop and viewed the inspection stations to determine whether they were kept clean, whether stock was properly piled and whether any item was on the emergency shortage list. He would contact the supervisory men and discuss their problems with them from the Inspection viewpoint as to technique, so that they might do their work more efficiently. He used his discretion and judgment in determining whether an item would be rejected, scrapped or sent to the Salvage Department. He made a final review of the work of the inspectors and formed his own judgment on the disposition of the items which were rejected by the inspectors. All the regular inspection work was handled by hourly rated employees. To accomplish the task of inspection of all the materials and parts going into the final assembly of tank or airplane engines, he had under him a force of 600 hourly rated inspectors and thirty super-

visory subordinates. In his discretion, he delegated his authority from time to time to these supervisory employees. He disciplined foremen when necessary and castigated employees if in his judgment they were doing the work improperly. He appointed assistants to act for him when in his judgment conditions warranted it.

Rolby organized the Inspection Department and established Management policies directly affecting the entire production effort at the Plant, and in all matters relating to quality of materials, his judgment was relied upon by the Company executives in the Plant when acting on behalf of the Company in its constant dealings with suppliers. He was responsible in the performance of his duties to only two men in the Plant, the Vice President in charge of Production, and the Executive Vice President of the Company, whom he regularly and directly assisted in the performance of their duties, and who were themselves bona fide executive or administrative employees. He had the final word with respect to inspection work as well as final standards and qualities.

Rolby stated at one point in his testimony, "The entire inspection effort was just dropped in my lap," and "I tried to keep all inspectors on their toes, keep the parts coming through right." He also stated, that, "The foremen would salvage work, and when they had anything that they were doubtful, well, they would get ahold of me and I would take care of it."

There were hundreds of separate parts going into a completed engine and on Rolby's shoulders rested the responsibility of determining that the manufactured parts were in perfect working condition and that all the requirements of Ordinance were satisfied. He co-ordinated the work of the Engineering Department and Production Department with his own Material Quality Department in accepting, rejecting, salvaging or remachining parts and scrap material. In the discharge of his managerial responsibilities, he was customarily required to make final decisions, and use his discretion in accepting or rejecting precision tools, jigs and other instruments and designs.

Rolby's recommendations for hiring and discharge of employees were regularly accepted, and among the exhibits introduced in the case there are "Notices of Employee's Dismissal," wherein he notified the Personnel Department that he discharged employees for various reasons. He also recommended hourly rated employees for promotion or upgrading. He not only interviewed people to determine their skills or qualifications for employment, but he also issued inter-departmental directives to the Personnel Department to carry out his minimum requirements for employment in Inspection. He would check the qualifications of inspectors and determine in his discretion and judgment whether they were qualified to continue as inspectors. He appointed foremen and recommended hiring of additional personnel. He also approved transfers.

When a union steward complained that a foreman was doing hourly rated employees' work, it was Rolby who used his discretion in deciding the dispute. His decision was subject only to an appeal to the Management Committee and Union Grievance Committee.

He approved all designs based on inspection factors, whether they were designed at Continental or by outside engineering firms, since he was ultimately responsible if defective or incomplete processed parts reached assembly. In dealing with Ordinance, Wright Aeronautical representatives, and Air Corps and Navy representatives, he performed a very important function in regularly assisting the highest officials in the Plant in solving the problems that were constantly present.

Three or four times a week, meetings were held by the President, Vice President, General Factory Manager, and Comptroller, at which time problems of the entire Plant would be discussed and reviewed, policies formulated and decisions made. Rolby was present as representative of Inspection to report on Inspection and to receive for and on behalf of Inspection detailed information of the status of the Plant, stressing manufacturing and production problems as relating to inspection and quality of parts.

In the performance of his managerial functions, it was inevitable that Rolby would handle parts and materials daily, but this was not in any degree performing the same work as the hourly rated employees under his direction. In his case, the handling of parts and material was necessary in the exercise of his discretion and judgment to decide whether the parts were acceptable for the purpose for which they were manufactured. No complaints were ever made that Rolby was doing the work of hourly rated employees.

The purpose of Salvage Division was to review rejections of inspectors on the process line. The salvage review work done by Rolby was not the same work done by hourly rated employees in the Plant, since it involved re-inspection of material which was already inspected by his hourly rated inspectors and scrapped because it was beyond blueprint limits. Rolby re-inspected it and if in his opinion it could be made to meet specifications by re-machining or by "compensating" for its being off-size, then he would approve the part. It was not routine inspection work in any sense of the word. Rolby did this work only on parts which were so critical that they threatened to shut the assembly line down unless action was taken by him to prevent it. He admitted that he did this work voluntarily and that it was not required of him by the Company.

In 1944 and 1945, when the Company was transferring over from the Wright engine to the engine designed by Ford for tank power plants, he was sent by the Company to the Ford Lincoln Plant to observe their operations and general methods of manufacturing this engine, "So that we could pick out the good points and use them in our own Plant, if possible."

The defendant has amply proved by a fair preponderance of all the evidence that Rolby's hours of work of the same nature as that performed by the nonexempt employees did not exceed 20% of the number of hours worked in any work week by the nonexempt employees under his discretion.

### Howard Phillips

Tool Design was an important department in the Continental Plant. High precision tools and parts necessary for the production of the engine were conceived and designed in that department. There were six classifications of employees working in the department: Layout men, Detailers, Junior Draftsmen, Checkers, Special Assignments, and Clerical help. These employees were not covered by the union contract.

The Tool Design Department's function was to put an idea on paper, as testified by Phillips. It was first necessary for the layout man to conceive the idea of a proper tool to be used for a certain purpose, and then draw it to proper dimensions and specifications on tracing paper. The detailer then broke the design down into its proper component parts and made further designs. The checker, who was the highest paid hourly rated employee, then went over the work of both employees to determine whether it was correct and acceptable. Work sheets were completed showing the quantity of tools to be ordered, and clerks typed up purchase requisitions. The tracings were blueprinted and the blueprints and requisitions went to Phillips for his final approval. Once approved, they furnished the basis for the purchase and manufacture of all types of machine tools, jigs, fixtures and inspection equipment used in the manufacture and inspection of engines at Continental.

The layout men in this department had an average experience of from twenty to twenty-five years in that work; and the junior draftsmen from two to ten years. It is unnecessary here to fully describe the detailed operations of the department except to stress its importance.

At the beginning of Phillips' employment he was placed in charge of this Department as Chief Tool Designer at an initial salary of $425 per month. His primary duty was the management of the Department. By 1944 he was receiving $625 per month, plus the various bonuses, which made his annual salary about $9,000 a year —one of the highest in the plant.

Phillips had a high school education which was supplemented by refresher courses in geometry. By study and experience, he became sufficiently proficient

to have become skilled in tool designing. He himself testified that tool designing work requires considerable technical ability.

The Tool Design Department was beyond any doubt a separate and distinct Department of the Plant and Phillips was its Supervisor or Manager, and it was operated by him under only general supervision of the Master Mechanic who was also responsible for other departments such as Process Engineering, Tool Trouble, Tool Room, Machine Repair and Cutter Grind. It was the Master Mechanic's responsibility to procure all machines, tools, jigs, fixtures, gauges and the like, required to produce the finished engine. This involved the designing of all tools, fixtures and jigs used in machining the various types of parts manufactured by Continental at the Plant and by outside manufacturers, which parts were eventually assembled into a completed engine. The Master Mechanic delegated his responsibility to various department heads, one of whom was Phillips, who was responsible for the designing and requisitioning of all tools, jigs, fixtures and gauges used in the Detroit Plant, whether manufactured by outside tool and die companies or by the Company at its Plant.

He regularly assisted the Master Mechanic and was held responsible for the accuracy ad technical acceptability of all tools designed by his Department. All the work of the Department required Phillips' approval before it was processed further. Phillips had an assistant whom he himself appointed, and three or more stenographers. His office was adjacent to the Master Mechanic's office.

When the Master Mechanic was absent, Phillips exercised his delegated authority with the concomitant responsibility of operating the Tool Design Department with efficiency and according to schedule. He consulted the Master Mechanic only in cases where he encountered difficulty, but by and large, and insofar as the ordinary operation of the Department was concerned, the Master Mechanic placed full reliance on Phillips to direct the operations of the Department.

Phillips approved orders for the Tool Design Department and checked requests for tools. These and other of his duties required expert knowledge of quality and fitness for the purpose for which the purchases were being made. He gathered information and used it in making out reports to his superior. These reports were based upon his expert knowledge, study and observation, and he made recommendations which were accepted.

His duties involved keeping the Master Mechanic regularly informed as to tool design problems, manpower problems in the Department, and the status and progress of tool design and orders for the manufacture of tools at Continental and outside so that decisions could be reached regarding the overall operation of the Plant.

Phillips was frequently requested to be present at meetings of Management, and his advice was relied upon in tool design work, future requirements in connection with that work, and special problems involving his Department. He attended such meetings either with the Master Mechanic, or without him.

He continuously exercised his discretion and judgment in deciding when additional workers were to be hired and he regularly interviewed applicants for work to ascertain whether they had the technical ability for the job and then recommended some to the Personnel Department as acceptable for hire and others for rejection. He also recommended salary at which they were to be hired subject to top limit. His recommendations were invariably accepted and acted upon, as were his recommendations for promotion and upgrading of employees. He regularly dismissed employees for lack of dependability and for other reasons in his judgment and discretion.

As head of Tool Design he was constantly consulted by the Engineering Department for changes of specifications, and by the Inspection Department for design of gauges and other inspection equipment.

The evidence is conclusive that his hours of work of the same nature as that performed by the nonexempt employees did not exceed 20% of the number of hours

worked in any work week by the non-exempt employees under his direction.

The testimony of all four plaintiffs reflects a studied and obvious effort to play down or minimize the importance of their positions, but to no effect, since the roles each of them played during their employment are too vividly portrayed by all the testimony as a whole in the case, and in the files and six volumes of records introduced as exhibits in the case. There are many documents which each of them prepared or signed in the course of their supervisory employment, which reflect such activities in their superior positions, capacities and responsibilities.

The testimony of each of the plaintiffs can only be characterized as unreliable and based on an unimpressive pretense of remembering incidents and details of events and periods of time despite the haze of intervening years and the frailties of human memory as to events occurring from four to ten years earlier. The testimony of the several supporting witnesses who themselves were employees of former employees of the Company and were plaintiffs in suits against the Company for over-time compensation, consisted of generalizations, also a pretense of remembering the number of hours in each work week that each of the plaintiffs performed manual work of the same type as the hourly rated employees directed by them.

The facts in this case must receive a realistic analysis in the light of Congressional finding and declaration of policy. 29 U.S.C.A. 202, in the enactment of the Fair Labor Standards Act: "(a) The Congress finds that the existence, in industries engaged in commerce or in the production of goods for commerce, of labor conditions detrimental to the maintenance of the minimum standard of living necessary for health, efficiency, and general well-being of workers" etc., results in burdens to interstate commerce as therein described, and that the legislation was intended to correct and eliminate such abuses and conditions. Considering the conditions existing at the time of the passage of that Act and the remedial purposes for which it was enacted, it is only too obvious that conditions under which plaintiffs were employed were not the type which Congress intended to remedy. "The purpose of Fair Labor Standards Act in relation to over-time pay for nonexempt employees is to grant right to overtime pay to that class of employees who come within commonly understood designation of workers as distinguished from managers, superintendents, foremen or bosses. Fair Labor Standards Act of 1938, §§ 13(a), 16, 29 U.S.C.A. §§ 213(a), 216." Rigney v. Wilson & Co., Inc., D.C., 61 F.Supp. 801.

The defendant has sustained the burden of proof and satisfied all the requirements of the law in classifying plaintiffs as bona fide executive or administrative employees under the Administrator's Regulations, and the conclusion is inevitable that they were in the utmost good faith properly classified as executive and administrative employees. The situation here presented parallels the condition appearing in Wells v. Radio Corporation of America, D.C., 77 F.Supp. 964, 967, where it was stated, "The proof of good faith by the Company is overwhelming. Not a scintilla of credible testimony was adduced to the contrary. The testimonial and documentary evidence on this somewhat lengthy trial revealed no single suspicious circumstance or any other proof of an attempt to deprive an employee of his just compensation by the use of an inaccurate and high-sounding title for a purely routine or manual job."

## Conclusions of Law

The burden of proof that plaintiffs are exempt from the operation of the Act rests upon the defendant. That burden has been sustained by the defendant by a fair preponderance of the evidence which definitely establishes the fact that each of the four plaintiffs qualifies for an exempted status under the evidence in this case as bona fide employees in both executive and administrative capacities, and that each of the plaintiffs was properly so classified under 29 U.S.C.A. § 216(b), 29 C.R.R. 541.1 (A), (B), (C), (D), (E) and (F), and 541.2 (A), (B) (1) and (3).

Defendant insists that Phillips should also be found to have been properly

classified as a professional employee. However, upon reviewing the evidence in his case, there appears to be serious doubt whether he could qualify under the professional exemption, Sec. 541.3 of the Regulations, and the proof in his case is inadequate to make a finding that he was a professional employee.

Plaintiffs' complaint, insofar as the claims of these four plaintiffs are concerned, is ordered dismissed.