STANGER et al. v. GLENN L. MARTIN CO.

Civil Action No. 1964.

District Court, D. Maryland.

March 24, 1944.

Nathan Hamburger, of Baltimore, Md., and A. Jere Creskoff, of Philadelphia, Pa., for plaintiff.

Charles C. G. Evans, of Baltimore, Md., and Harold G. Mosier, of Cleveland, Ohio, for defendants.

COLEMAN, District Judge.

This is a suit under the Fair Labor Standards Act of 1938, 29 U.S.C.A. §§ 201–219, to recover alleged unpaid overtime earnings, for an additional equal amount of liquidated damages, and an attorney's fee.

The Court is satisfied from the weight of the credible evidence that none of the plaintiffs is entitled to recover and that, therefore, the complaint must be dismissed as to all.

The issue here is a relatively narrow one and turns solely upon the construction to be placed upon Section 13(a) of the Fair Labor Standards Act of 1938, 29 U.S.C.A. § 213(a), which, insofar as relevant to the present case, reads as follows: "The pro-

visions of sections 206 and 207 of this title [which prescribe maximum hours and minimum wages] shall not apply with respect to (1) any employee employed in a bona fide executive, [or] administrative \* \* \* capacity, \* \* \* (as such terms are defined and delimited by regulations of the Administrator), \* \* \*."

Pursuant to the authority thus vested in the Administrator of the Wage & Hour Division of the Department of Labor, he has defined, by Regulation as follows, the words "executive" and "administrative" as used in the Act:

"Section 541.1.—Executive.

"The term 'employee employed in a bona fide executive \* \* \* \* capacity' in section 13(a) (1) of the Act shall mean any employee—

"(A) whose primary duty consists of the management of the establishment in which he is employed or of a customarily recognized department or subdivision thereof, and

"(B) who customarily and regularly directs the work of other employees therein, and

"(C) who has the authority to hire or fire other employees or whose suggestions and recommendations as to the hiring or firing and as to the advancement and promotion or any other change of status of other employees will be given particular weight, and

"(D) who customarily and regularly exercises discretionary powers, and

"(E) who is compensated for his services on a salary basis at not less than $30 per week (exclusive of board, lodging, or other facilities), and

"(F) whose hours of work of the same nature as that performed by nonexempt employees do not exceed 20 percent of the number of hours worked in the work week by the nonexempt employees under his direction; provided that this subsection (F) shall not apply in the case of an employee who is in sole charge of an independent establishment or a physically separated branch establishment.

"Section 541.2.—Administrative.

"The term 'employee employed in a bona fide \* \* \* administrative \* \* \* \* capacity' in section 13(a) (1) of the act shall mean any employee—

"(A) who is compensated for his services on a salary or fee basis at a rate of not less than $200 per month (exclusive of board, lodging, or other facilities), and

"(B) (1) who regularly and directly assists an employee employed in a bona fide executive or administrative capacity (as such terms are defined in these regulations), where such assistance is nonmanual in nature and requires the exercise of discretion and independent judgment; or

"(2) who performs under only general supervision, responsible nonmanual office or field work, directly related to management policies or general business operations, along specialized or technical lines requiring special training, experience, or knowledge, and which requires the exercise of discretion and independent judgment; or

"(3) whose work involves the execution under only general supervision of special nonmanual assignments and tasks directly related to management policies or general business operations involving the exercise of discretion and independent judgment."

We doubt whether any of these three plaintiffs may correctly be treated as "executives" either within the meaning of the Act or the Regulation quoted above, interpreting the Act, but we do not have to decide this question, because by the weight of the credible evidence, we find all three plaintiffs clearly within the alternative definition of an "administrative" employee, quoted above, and they therefore fall within the exemption of the Act.

Regulations of the Administrator have the force of law provided they reasonably construe the language and the clear intention of the statute. There is no contention in the present case that the particular regulations with which we are concerned do not do so. In fact, the Court believes that at least the "administrative" regulation may be accepted as valid.

The question whether a given employee is exempt under the Act becomes, in the last analysis, purely a factual question. Each case must stand on its own facts and, therefore, it becomes necessary to determine what the weight of the credible evidence in each case indicates was the precise character of the work and the precise status of the particular employee.

Before coming directly to an analysis of the evidence in the present case, it is appropriate to consider, at least in a broad sense, just what type of person is intended to be included by the Act and the regulation defining an "administrative" employee.

■ As set forth in the Report and Recommendations issued under date of October 24, 1940, by the Administrator wherein is found the construction of the Regulation here involved which the Wage and Hour Division follows in enforcing the Act, we may reasonably deduce the following: The terms "executive" and "administrative" are, to a large extent, overlapping in common usage, but we may assume they were not intended to cover precisely the same types of employment or they both would not have been used. If the term "administrative" be defined as merely a lower form of "executive", then all executives would qualify under the "administrative" definition and the term might well have been left out of the Act. It is appropriate to limit the term "executive" to persons whose duties include some form of managerial authority, that is to say, to persons who actually direct the work of other persons, and to apply the term "administrative" to persons performing a variety of miscellaneous but important functions in business. This latter group, therefore, is obviously large in modern industry, much larger than the group covered by the term "executive."

■ The salary qualification is one, but only one, of the necessary limiting requirements. It is not in and of itself conclusive. It is to be noted, however, that in the case of all three of the present plaintiffs their salaries were substantially in excess of the minimum prescribed in the Regulation. Similarly, a title alone may be of no great assistance in determining the true character of the work. Thus, while some superintendents of maintenance may be exempt under the Act because of either their executive or their administrative work, the janitor of a building might be called a superintendent of maintenance, yet obviously, such an employee would not come under the definition of one employed in an administrative capacity within the meaning of the Act.

Again, a person may be described as a statistician who is little, if anything, more than a tabulator or clerk. On the other hand, he may be one who plays a major part in determining the financial policy of his company. Still another example is to be found in the term "personnel director." In some plants he may be merely a clerk. In others he may be charged with the duty of formulating and determining the company's personnel policies affecting all of the company's employees, who may number many thousands.

■ The extent to which discretion or independent judgment, and the duty of making recommendations are involved, is one of the most important elements in determining whether a person's work is of an administrative character. Thus, advisory specialists may come under such a definition, as well as tax experts, sales experts, etc. This broad class could include those employees who establish precedents and assist in the determination of policies.

■ In other words, the differentiation between a mere clerk and one with actual administrative ability may be said to lie very largely in, (1) the exercise of discretion and independent judgment, and (2) in receipt of a salary that is above that customarily paid to one engaged primarily in mere manual or clerical work.

We turn, then, to the facts in the present case. Counsel for the defendant company has set forth, in his brief, a summary of what he claims are facts and circumstances existing with respect to each plaintiff, the nonexistence of which the plaintiffs must prove by the weight of the credible evidence, otherwise they are excluded from the Act's provisions as to hours and wages.

The Court agrees with this contention of defendant's counsel, and also finds that none of the facts and circumstances as set forth in this summary have been overcome by the plaintiffs. Therefore, the Court adopts, as its findings, substantially the narration of facts as set forth in defendant's brief as follows:

■ First, as respects the plaintiff Wheeler, there was no formal contract of employment. He, like the other two plaintiffs, was employed in the production department. His salary was $400 per month when he began on August 11, 1941, but shortly thereafter was increased to $425, and so remained until he resigned on February 23, 1943. After a short period of what may appropriately be called a period of training because, as one of his superiors described the status of the defendant company at that time, it was having "growing pains", and one entering upon the work that plaintiff Wheeler agreed to undertake was naturally expected to undergo a good deal of training which could not probably be clearly defined, and might embrace many different tasks—even clerical or manual

work to some extent—he was made an assistant supervisor of production at Plant 2 of defendant company. He continued to hold this position until he resigned. Clearly, his superior, the supervisor of production in this plant, was employed "in a bona fide executive or administrative capacity" as defined in the Regulations.

In the production department at Plant 2, there were eight sections, the functions of which, summarized, may be stated as follows: (1) *Order writing section,* to write up several thousand orders for the manufacture of the various parts needed in making airplanes, and to turn over such orders to the (2) *records and planning section.* The function of this latter section was to plan and schedule the issuance of the various orders to the manufacturing division in proper sequence, so as to insure a continuous flow of production; to approve the issuance of duplicate or reorganization orders made necessary for various reasons; and to maintain records of all orders issued to the manufacturing division. (3) *Detail dispatch division,* the function of which was to handle the storing and dispersing of many different tools used by the manufacturing division in the fabrication of parts; the assembling of tools and blueprints needed by the manufacturing division to fabricate the parts called for by each order; to deliver with each order the necessary blueprints and tools to the proper station in the manufacturing division, and to transfer the jobs from operation to operation within departments. (4) *The stock room section,* whose function it was to receive, bin and disperse to the assembly departments many thousand different types of parts; to maintain records showing at all times the quantities of the various parts on hand, and to dispose of parts no longer needed for one reason or another. (5) *The production section,* whose function it was to expedite and follow up the fabrication and delivery of parts to the assembly departments. (6) *The transportation section,* whose function it was to transport materials and parts from department to department within the plant. (7) *The sub-contract-follow-up section,* whose function it was to follow up all subcontract items in order to insure delivery to the Company of all such items in accordance with fixed delivery schedules. (8) *The spare parts section,* whose function it was to deliver to the Government spare parts in accordance with fixed delivery schedules, and take

such action as might be necessary to insure their prompt delivery.

The weight of the credible evidence establishes that the foregoing functions were the functions of the eight different sections of the production department when plaintiff Wheeler was an assistant supervisor in Plant 2, and that he shared constantly in planning and making recommendations touching these various functions. Such being true, we will not pause to go into the various refinements of that employment. There is conflict in the evidence as to just what power Wheeler had with respect to recommending a change of personnel in his department, that is, as to hiring and firing, and we may even assume that he had no such power but merely the power to recommend; but this is not conclusive of whether he had, or did not have, an "administrative" status, because hiring and discharging throughout the entire plant was a prerogative usually only of the personnel department and not of the various departments or sections or their heads.

Turning then, next, to what the weight of the credible evidence discloses as to the plaintiff Stanger, again, the summary of his work as set forth in the brief of the defendant company is amply sustained by the weight of the credible evidence. He likewise entered upon his work without a formal, written contract. He commenced in April 1942, at a monthly salary of $325, which continued until he resigned in March, 1943. He was made chief of the production liaison group in D Building, which was a large structure some 300 yards long and 100 yards wide. The plane known as the PBM-3 was assembled in this building. He organized, or helped to organize and supervise, the liaison group of the production department in that building. Among the duties of that group was the responsibility of maintaining records showing the progress in the various jobs, for the purpose of detemining whether the schedules were being met, and keeping the assembly floor at all times supplied with tools and materials in accordance with schedule requirements.

He was the supervisor of the stock room in "B" Building where some eighty persons were employed. This stock room received, binned and dispersed to the assembly floor many thousand different types of parts. He arranged, or helped to arrange and supervise, the transfer of parts from the main stock room to the basements of the various

stock rooms erected on the assembly floor. He supervised the preparation of progress charts and the compilation of various types of information about tools therein. He assisted in the making of various surveys, investigations, reports and recommendations concerning special production problems, such as the concentration of materials, methods to be followed in the course of writing of orders, and carrying of parts requiring reworking.

Lastly, with respect to the plaintiff Kyle, he also entered into no formal agreement with the defendant company. His employment commenced on December 2, 1941, at a monthly salary of $275, which was increased several months later to $325, and again to $375. He resigned on February 23, 1943. We likewise in his case adopt the summary of facts in defendant's brief as being in conformity with the weight of the credible evidence. Those facts are substantially as follows: Kyle organized the surveys and planning section that planned and scheduled the issuance of orders for the component parts involved in the making of the Martin airplane known as Model 187; planned and supervised the taking of inventories of all parts theretofore manufactured at Plant 2 in connection with the Company's existing contract; analyzed the results of such inventories for the production department, and analyzed the type of parts still to be manufactured in order to complete the company's contracts. He acted as head of the records and planning section at Plant 2, and directed the work of persons employed there. He acted as co-ordinator between the Crown Cork & Seal Company, a subcontractor, and the Martin Company on a large subcontract, to determine the component parts needed by that subcontractor, and provided for their procurement and the establishment of assembly schedules and schedule procedures. He made recommendations regarding the procedure to be followed in establishing the stock rooms in Plant 2, and supervised the installation of such stock rooms. Plaintiff Kyle also acted as a staff assistant and made various surveys, studies, recommendations and reports.

The Court does not overlook the fact that shortly after plaintiff Kyle began to work for the defendant company, he received an employment slip which described him as "clerk, planning and scheduling." Emphasis is laid upon that document as indicating that his status did not ascend above the scale of an ordinary clerk and that therefore he could not have been within the exemption in the Act. However, we lay but little emphasis upon that routine document in the face of what we find to have been the actual work that plaintiff Kyle did. It is to be assumed from his own testimony about the work he was doing· at that time, that, had he then been treated as a mere clerk, he would have strongly repudiated any such disparaging designation of his status.

It is true there is a good deal of uncontroverted testimony to the effect that all of the plaintiffs, from time to time, did some manual work. But there is no convincing proof that they were expected or required to do as much as they testified they did. However, it must be said to their credit that they apparently did it because they were all working under high pressure. The Company was suffering from "growing pains"—faced with a tremendous war emergency—and it is not reasonable to assume that any one employed in this great plant, as were the plaintiffs, could have determined much in advance, if at all, how many hours per day or per week he might have to work, or·precisely upon what particular task. So, whether it was forty-five or fifty per cent of their time which, as they claim, they devoted to work of a clerical nature, or whether it was much less, is not conclusive of the issue before us. The important question, as the Regulation of the Administrator sets forth, is the extent to which the exercise of discretion and independent judgment was involved.

To summarize: We believe that this is a case of three competent, experienced plant administrators, who agreed to undertake rather general and, to a large extent, unknown tasks of an administrative character, in helping to speed up and make generally more efficient the company's airplane production. All three of them developed, as time went on, dissatisfaction with (1) the limited extent to which their ideas were favorably received or adopted by their superiors; (2) the kind of work allotted to them; and (3) the amount of their compensation. But we can not blink the uncontradicted testimony that it was not until the very close of their employment—when they tendered their resignations—that they ever raised the question whether they were, in fact, employed exclusively upon an agreed salary, or whether they were entitled to additional compensa-

tion under the Fair Labor Standards Act. Under such circumstances, to allow the plaintiffs to recover would result in a clear abuse of both the expressed and implied intent of the Act, and would be a precedent for the indirect annulment of the mutuality of contractual relations between employer and employed, which is the very basis of free enterprise.

Of course, these plaintiffs, like any one else employed by the Martin Company or any other private corporation, had the right to protest the amount of their compensation, to ask for more, and to resign if they did not get it. Likewise, they could have resigned when they became dissatisfied for whatever reason with the work to which they were assigned. It is significant that they worked without protest, up to the time when they tendered their resignations, upon a fixed monthly salary exclusively, which in the case of Wheeler and Kyle was increased. Instead of simply exercising the normal prerogative which they had, i. e., the right to resign, if dissatisfied, they now also attempt to distort or convert their employment into another type for the purpose of avoiding the exemptions under the Act, and thereby getting several thousand dollars more than the salaries which they agreed to accept, and did accept without protest for more than a year.

For the reasons given, the complaint as to all three of the plaintiffs must be dismissed with costs.