Ray MARSHALL, Secretary of Labor,
United States Department of
Labor, Plaintiff,

v.

BURGER KING CORPORATION,
Defendant.

No. 77 C 2140.

United States District Court,
E. D. New York.

Dec. 9, 1980.

Carin Ann Clauss, Sol. of Labor, Washington, D. C., Francis V. LaRuffa, Regional Sol., New York City, by Steven M. Guttell, Washington, D. C., for plaintiff.

Kelley Drye & Warren, New York City, by Martin D. Heyert and Paul L. Bressan, New York City, for defendant.

SIFTON, District Judge.

This is an action brought pursuant to 29 U.S.C. § 217 to restrain violations of the Fair Labor Standards Act of 1938, as amended, 29 U.S.C. §§ 201 *et seq.* (the "Act"), specifically, failure to pay overtime compensation said to be due certain employees of defendant pursuant to 29 U.S.C. § 207 and failure to keep related records pursuant to 29 U.S.C. § 211(c) in violation of 29 U.S.C. § 215(a)(2) and (a)(5), respectively. Trial of the case was conducted before the undersigned, sitting without a jury, during the week of April 7, 1980.

What follows sets forth this Court's decision and contains its findings of fact and conclusions of law as required by Rule 52(a) of the Federal Rules of Civil Procedure.

The Court has subject matter jurisdiction over this controversy pursuant to 29 U.S.C. § 217. Plaintiff is the Secretary of Labor of the United States Department of Labor. Defendant is a corporation, engaged in the retail, fast-food restaurant business, which owned and operated five such restaurants in this District in the period May 1, 1974, when the Act's provisions with respect to overtime pay first became applicable to retail service establishments, Fair Labor Standards Amendments of 1974, Pub.L. No. 93–259, § 15, 88 Stat. 65 (1974), to date. Four of these restaurants, at 2800 Hylan Boulevard, 1565 Hylan Boulevard, 2901 Richmond Avenue, and 20 Willowbrook Road—all on Staten Island—were sold by defendant on October 20, 1978. The other, located at 39–60 Sunrise Highway in Seaford, New York, was still owned and operated by defendant at the time of trial.

The parties are agreed for purposes of this litigation that defendant is an "employer" within the meaning of 29 U.S.C. § 203(d), is an "enterprise engaged in commerce or in the production of goods for commerce" within the meaning of 29 U.S.C. § 203(b), (j), (r), and (s)(1), and is otherwise "covered" by the applicable provisions of the Act with respect to the Assistant Managers I and II employed by defendant at the five restaurants referred to above.

At trial, plaintiff established that defendant employed as Assistant Managers I or II in its business at least eighteen persons—twelve of whom appeared as witnesses for the plaintiff—at one or more of the five stores referred to above, during the time subsequent to May 1, 1974, when each store was owned by defendant, for work weeks in excess of forty hours, without compensating those employees for their overtime hours at the time-and-one-half rate or better required by law. *See* 29 U.S.C. § 207(a)(1). The parties have agreed that for purposes of this action the eighteen employees may be deemed to have worked a fifty-hour

week during each week of the period of their employment listed on a stipulation received in evidence at the trial as Court's Exhibit 1.

Since overtime compensation was not paid, it goes without saying that payroll and other records containing information with regard to the excess compensation required to be maintained pursuant to 29 U.S.C. § 211(c) and 29 C.F.R. § 516.2(a)(9) were not kept by defendant.

Defendant has pleaded, as an affirmative defense to both the claimed overtime and record-keeping violations, that recovery with respect to part of the period covered by the complaint—namely, May 1, 1974, to August 27, 1974—is barred by the two-year statute of limitations set forth in 29 U.S.C. § 255(a). Plaintiff responds with respect to this last defense that defendant's violations were willful; and, accordingly, the entire period since the time the Act became applicable to defendant's establishment is within the three-year statute of limitations for causes of action "arising out of a willful violation" set forth in the same statute.

In addition, defendant has pleaded as an affirmative defense that its Assistant Managers are exempt from the provisions of sections 207 and 211 of the Act. The exemption relied on by defendant is that applicable to employees "employed in a bona fide executive ... capacity ... (as such term ... [is] defined and delimited from time to time by regulations of the Secretary ...)" set forth in 29 U.S.C. § 213(a)(1). The applicable regulations of the Secretary, 29 C.F.R. § 541.1, provide in relevant part:

"The term 'employee employed in a bona fide executive ... capacity' in section 13(a)(1) [29 U.S.C. § 213(a)(1)] of the act shall mean any employee:

"(a) Whose primary duty consists of the management of the enterprise in which he is employed or of a customarily recognized department or subdivision thereof; and

"(b) Who customarily and regularly directs the work of two or more other employees therein; and

"(c) Who has the authority to hire or fire other employees or whose suggestions and recommendations as to the hiring and firing and as to the advancement and promotion or any other change of status of other employees will be given particular weight; and

"(d) Who customarily and regularly exercises discretionary powers; and

"(e) Who does not devote more than 20 percent, or, in the case of an employee of a retail or service establishment who does not devote as much as 40 percent, of his hours of work in the workweek to activities which are not directly and closely related to the performance of the work described in paragraphs (a) through (d) of this section: *Provided*, That this paragraph shall not apply in the case of an employee who is in sole charge of an independent establishment or a physically separated branch establishment, or who owns at least a 20-percent interest in the enterprise in which he is employed; and

"(f) Who is compensated for his services on a salary basis at a rate of not less than $155 per week (or $130 per week, if employed by other than the Federal Government in Puerto Rico, the Virgin Islands, or American Samoa), exclusive of board, lodging, or other facilities: Provided, That an employee who is compensated on a salary basis at a rate of not less than $250 per week (or $200 per week, if employed by other than the Federal Government in Puerto Rico, the Virgin Islands, or American Samoa), exclusive of board, lodging, or other facilities, and whose primary duty consists of the management of the enterprise in which the employee is employed or of a customarily recognized department or subdivision thereof, and includes the customary and regular direction of the work of two or more other employees therein, shall be deemed to meet all the requirements of this section."

■ Defendant bears the burden of proof with regard to establishing its entitlement

to these exemptions by a preponderance of the evidence. *See Idaho Sheet Metal Works v. Wirtz*, 383 U.S. 190, 86 S.Ct. 737, 15 L.Ed.2d 694 (1966); *Mitchell v. Kentucky Finance Co.*, 359 U.S. 290, 291, 79 S.Ct. 756, 757, 3 L.Ed.2d 815 (1959); *Phillips v. Walling*, 324 U.S. 490, 493, 65 S.Ct. 807, 808, 89 L.Ed. 1095 (1945); *Brennan v. South Davis Community Hospital*, 538 F.2d 859, 865 (10th Cir. 1976), *quoting Legg v. Rock Products Manufacturing Corp.*, 309 F.2d 172, 174 (10th Cir. 1962); *Schmidt v. Emigrant Industrial Savings Bank*, 148 F.2d 294, 295 (2d Cir. 1945); *Wirtz v. Patelos Door Corp.*, 280 F.Supp. 212 (E.D.N.C.1968); *Marshall v. Coastal Group Management*, 88 Lab.Cas. ¶ 33,906 (D.N.J.1980).

■ It is the conclusion of this Court that defendant has satisfied this burden with respect to all or a portion of the overtime claimed with respect to 3 of the 18 employees who are the subject matter of this litigation by establishing by a preponderance of the evidence that, during the time these employees were compensated on a salary basis in excess of $250 per week, their primary duty consisted of the management of the enterprise in which they were employed and that they customarily and regularly directed the work of 2 or more fellow employees. 29 C.F.R. § 541.1(f). Accordingly, these employees are exempt from the overtime and record-keeping provisions of the Act for the periods of time they earned in excess of $250 per week. With respect to the balance of the time of the employees whose wages and records are the subject of this litigation, the Court concludes that the defendant has failed to establish by a preponderance of the evidence that they were employed in a bona fide executive capacity, as defined in the Secretary's regulations, because defendant has not demonstrated that each of these employees devoted 60% of the hours in his or her work week to the management of the enterprise, the direction of work of fellow employees, personnel decisions, the exercise of discretionary powers, or activities directly and closely related to those types of work, as defined in the Secretary's regulations. Accordingly, defendant must be found to have violated the record-keeping and overtime provisions with regard to these employees. The Court further concludes that such violations were willful and are likely to be repeated unless restrained by injunctive relief. The basis for these determinations is set forth below.

At each of the five locations referred to above, the defendant, during the relevant period, sold a limited line of "fast foods" centered on its own version of the traditional American combination of hamburger, milkshake, and french fries. The price range for the limited items on its menu ran from $.25 to $2.00. The gross annual sales at each of the five locations at issue ran from a high of approximately $847,000 to a low of approximately $575,000.

At each of the subject locations the defendant considered between 40 and 60 employees to be currently employed on an hourly basis. However, as noted below, at any particular point in time, the actual hourly work force on duty was considerably smaller. The hourly work force was characterized by an unusually high rate of turnover.[1] Individual hourly workers were employed, by and large, at the minimum wage and for minimum hours.[2] The work force

---

1. While an annual turnover rate of close to 300% was testified to, this turnover does not appear to have necessitated unusual amounts of on-the-job-training. A significant number of "new" employees, counted as such in calculating the turnover, worked for defendant before, either at other locations or on other occasions. Additionally, work performed by the hourly employees has been extraordinarily simplified and routinized as a result of defendant's method of doing business and is, judged from the evidence, quickly learned from co-workers.

2. According to the testimony, hourly workers were called into work for the rush hours and then sent home after they had completed a minimum of 3 hours' work as part of a regular effort on defendant's part at the locations covered by this litigation to assure that payroll expenditures did not exceed stated goals—a phenomenon known colloquially among the workers as "blowing payroll," discussed at greater length below. Thus, on a single shift, the number of hourly employees at the locations at issue would regularly vary from as few as 4 to upwards of 25.

included a large number of high school students, working during their school vacations at their first job, and housewives working part time to supplement family income.

The food products offered by defendant's establishments were, in the period covered at trial, limited and standardized so that their preparation was quickly learned and easily supervised. In addition, other aspects of the running of the establishments, including the servicing of customers, taking of cash, ordering of food, handling of cash and inventory, and the disciplining and training of employees, had been reduced to a series of standardized routines established by company policy set forth in written procedures and implemented by the completion of a series of standardized forms.

Each of the five restaurants was, during the relevant period, in the sole charge of a Restaurant Manager, considered by the defendant to be responsible for its operation at all times, whether present on the premises or not.[3] Each Restaurant Manager was, during the relevant period, assisted by one or more assistant managers, known as Assistant Managers I and II.

The work of the Assistant Managers I and II was, in theory and as described in the defendant's job specifications, essentially of the type characterized in the Departmental regulations quoted above as executive. The employees holding the positions were, for the most part, considered responsible for managing the restaurants in the absence of the Restaurant Managers. They were to direct the work of other employees in those situations in which the employees needed direction. Their involvement in personnel decisions as described in the defendant's job specifications, was substantial. The Assistant Managers were, in theory,

expected to customarily and regularly exercise some discretionary powers—most particularly the scheduling of the work force. Employees holding these positions were also expected to do some work of the type ordinarily performed by hourly employees. Most of this work was, in theory, to be "directly and closely related" to other executive-type work—namely, training hourly employees by example and, on occasion, relieving short-term bottlenecks. *Cf. Anderson v. Federal Cartridge Corp.*, 19 Lab.Cas. ¶ 66,093 (D.Minn.1950). In no event, they were instructed, were they to spend more than 40% of their time in such activities.

In actual practice, however, it is apparent that the employees holding these jobs at the subject restaurants during the period of time here at issue did not utilize their time in performing executive functions to anything like the degree which defendant claims. While the defendant's job specifications describe Assistant Managers as authorized to "hire and assign job positions to foodhandlers," there is little or no evidence that this was done by the employees on whose behalf overtime is sought in this case. Nor do these employees appear to have had, as a regular and substantial part of their job, other personnel decision-making of the type considered to be executive. Much of the work characterized by the defendant as discretionary in nature was, according to the credible evidence, either not done by the employees here at issue—for example, ordering of food—or was in fact a far less time-consuming part of the job than one would suppose from the time taken at trial and in the briefs to describe it—for example, counting cash, taking inventory, and counting waste.[4] Other jobs were per-

---

3. Recognizing that it is this individual who is in sole charge of the restaurant, defendant has not sought to assert the "sole charge" exception to the requirement that executive employees devote at least 60% of their time to management-type work. 29 C.F.R. § 541.113(d).

4. It is, indeed, a measure of the minimal discretion vested by defendant in its managerial employees that an almost continuous check is kept not merely on cash, but also on inventory by means of defendant's computerized sales

equipment, its forms for counting cash and inventory, and its physical counts not merely of inventory on hand, but of waste product discarded as garbage. This counting of waste, including buns and "burgers" not suitable for sale, is, incidentally, among the categories of work categorized as discretionary. The issue, however, is not whether the work is in fact discretionary, but how much time it takes to perform. The evidence demonstrates that under defendant's system of operations work of

formed on a much more irregular and sporadic basis than claimed by defendant. For example, on-the-job training appears from the credible evidence to have been provided new employees by other hourly employees more often than by Assistant Managers and to have been, as noted above, a much less onerous task than suggested by defendant's 300% annual turnover figure.[5] Personnel decisions appear from the credible evidence to have been almost entirely in the hands of the Restaurant Managers. Although the job specifications for Assistant Managers provided that they were to evaluate the performance of hourly employees for the purpose of taking appropriate personnel actions and although forms existed for the purpose of recording observations and actions of that nature taken by Assistant Managers, in fact, few of the Managers on whose behalf back wages are sought appear to have ever performed such evaluations or taken personnel actions, and none appear to have spent any appreciable portion of their work day in such activities.

■ With regard to the three Assistant Managers who during all or part of the period of their employment earned more than $250 a week, the issue is whether their "primary" duty consisted of the management of the enterprise in which they were employed.[6] Plaintiff interprets this regulation as meaning that an Assistant Manager in this category must be shown to have spent more than 50% of his time managing the enterprise. This interpretation is not supported either by ordinary English usage or by the context of the regulation in which the reference to "primary duty" appears. "Primary," as a matter of English usage, would mean greater than 50% only in a situation in which there were only two types of duty at issue. However, the regulation itself recognizes managerial functions to be only one of several different types of executive work. Thus, "primary" is much more plausibly interpreted in its usual sense as meaning chief, principal, or first of several functions. *See Topel v. Northern Virginia Sun, Inc.*, 77 Lab.Cas. ¶ 33,274 at 47,071 (E.D.Va.1973), *aff'd*, 77 Lab.Cas. ¶ 33,275 (4th Cir. 1975). The evidence quite clearly establishes that management was the primary function of these employees so defined. They were managers in title. Those who testified on the subject almost unanimously acknowledged that their principal function and responsibility was management of the enterprise, although admitting at the same time that their other duties, including their performance of their non-executive functions, made it difficult to fulfill their management responsibilities. *Cf. Wirtz v. Arcata Plywood Corp.*, 18 59 Lab.Cas. ¶ 32,131 (E.D.Cal. 1969). While it is worthy of consideration whether an enterprise as highly routinized and organized as this one—in which almost all aspects of the operation are constantly monitored at other locations by computer and by standardized reporting forms—operates essentially without management on the scene, the fact of the matter is that managerial functions do exist even in such a situation. While the restaurant's internal operations were carried forward with minimal need for oversight by a person on the scene, dealings with third parties—that is, customers and members of the community—do require a manager, and it was the

this sort in fact takes little time to perform, although, as the length of the trial and of defendant's briefs indicates, these tasks can be described at great length and in minute detail. The issue of whether these tasks are discretionary or merely routine bookkeeping and inventory taking can be left for another day, as unnecessary to this decision.

5. Defendant attempts to liken this case to cases like *Paddy v. Smith d/b/a Leesville Piggly Wiggly Stores*, 70 Lab.Cas. ¶ 32,836 (W.D.La.1973), and *Schumaker v. Maiden Form Brassiere Co.*, 16 Lab.Cas. ¶ 65,219 (N.D.W.Va.1949). How-

ever, nothing in the evidence here suggests that the work of the Assistant Managers was necessary for training or "only for a few minutes at a time" as in those cases. Nor is the hourly work here necessary to locate bottlenecks as in *Anderson v. Federal Cartridge Corp.*, 19 Lab. Cas. ¶ 66,093 (D.Minn.1950).

6. The "executive" status of the three employees who earned more than $250 a week for the period during which they earned that sum is to be judged by the so-called short-form test set forth in the Department's regulations quoted above.

primary function of the Assistant Managers I and II while on duty to fulfill that role.

The crux of the case with regard to the employees earning less than $250 a week is whether the "executive" activities performed by the Assistant Managers amounted to 60% or more of the hours they worked in a week. It is the finding of this Court that they did not. On the contrary, it appears that the Assistant Managers whose back wages are here at issue spent at least half of their time doing the same work as the hourly employees not because that work was "directly and closely related" to their executive functions, but rather, to avoid calling in additional hourly employees and thereby "blowing payroll"—that is, spending more than the store's budgeted amount for hourly labor.[7] This work, according to the credible testimony, included at times food preparation and cleaning of both the restaurant and the food preparation equipment. More often, however, this work involved actually serving customers or expediting the transmission of prepared food from kitchen to customer. Witness after witness testified in an entirely credible fashion that, although the Assistant Managers did, indeed, have managerial functions in addition, the major part of their time at the restaurants in question during the time they were employed consisted of working as an extra hand in serving customers during the high volume meal periods in order to keep down the size of the hourly work force.[8]

Defendant, relying on *Wells v. Radio Corporation of America*, 77 F.Supp. 964, 972 (S.D.N.Y.1948), taxes the employees who testified that they spent over half their time doing hourly work with lacking records or memoranda to refresh their recollection as to the amount of hours actually spent in this activity. The answer to this argument is two-fold. First, the burden is on defendant to establish the exemption and the record-keeping obligations lie with it, not with individual employees. In any event, the testimony of the witnesses was to the amount of time they spent doing hourly work in order to avoid "blowing payroll." Thus, the testimony cannot, as defendant seeks to do, be faulted for failure to distinguish between time spent training employees, eliminating bottlenecks, "setting the pace" or responding to emergencies and other time spent doing hourly work. The twelve employees who testified did so with remarkable consistency, and each identified with reasonable precision the time spent doing hourly work because of the deliberately imposed shortage of other hands to meet the customer demands.

Defendant also seeks to counter the overwhelming testimony presented by the Government on this score by pointing to its instructions that hourly work was to be kept to a minimum and suggesting that, if hourly work took as long as the employees testified it took, other supervising functions assigned to the employees would not be efficiently performed. As noted above, however, the employees simply were unable to comply with defendant's instructions, given the pressures created by the mandate to maintain the proper ratio of manpower to production.[9] Moreover, the employees'

---

7. Cf. *Wirtz v. Muskogee Jones Store Co.*, 293 F.Supp. 1034, 1041 (E.D.Okla.1968), in which a department store's department head spent half his time selling merchandise not in order to replace an hourly worker, but rather to acquire "information concerning the interest and desirability of various products" in order to carry out his administrative functions as a buyer for his department. There is no indication in this record that the Assistant Managers here worked the amount of time they did for any such purpose.

8. Defendant contends that, since plaintiff only called 12 of the 18 employees on whose behalf back pay is sought, relief can only be awarded those 12. The argument is frivolous. Defendant has the burden of proof. The witnesses who testified established a general practice at the five stores at issue during the applicable period which, in the absence of credible rebuttal testimony, warrants an inference that the uncalled employees operated in the same fashion under the same pressures as those who were called.

9. The suggestion by defendant, relying on *Raque v. Dexter Foldin Co.*, 1 Lab.Cas. ⸗ 64,871 (S.D.N.Y.1948), that the employees somehow volunteered the time they spent as hourly workers in excess of stated company guidelines is, in the circumstances, frivolous.

testimony makes clear that their other managerial functions, while not as complex and time-consuming as defendant's description of them, in fact, were not efficiently performed. On the contrary, employee after employee testified that in order to finish his managerial tasks he or she was required to work substantially longer than the customary eight-hour, or even ten-hour, day. In short, the issue is not, as defendant sees it, whether defendant's Assistant Managers were working foremen or executives. The issue is simply whether defendant exploited employees in a transitional stage in their promotion from hourly worker to executive functions by obliging them to work both as an extra hand and as lower echelon management. This Court finds that defendant did just that.

Since this finding turns in large part on the evaluation of the credibility of these witnesses, it bears noting that a significant number of the witnesses for the Secretary credibly testified that they were not aware that they still had a stake in the outcome of this case. Many had left employment with the defendant for other, in many cases, better paying, jobs. In all events, the witnesses' stake in the outcome is in fact relatively small, and their overall manner of testifying, with one or two exceptions, betrayed little interest in the way the case was decided. Equally significant was the inability of the defendant to impeach these witnesses through any records or by other customary means. Despite the fact that practically all other important aspects of defendant's operations were tracked by daily records and despite defendant's keen awareness, discussed below, of the 40% rule set forth in the regulations quoted above, no effort was made by defendant to record the amount of time spent by their Assistant Managers on the kind of work performed by hourly employees, so as to control deviations from its stated policy on the matter and so as to enable defendant to establish in a case such as this its entitlement to the executive exemption.

■ The conclusion that defendant's violations were willful is compelled by the evidence that, despite a clear awareness that the Assistant Managers were the subject of Department of Labor scrutiny and were required to adhere to the recently promulgated 40% work rule,[10] little if any effort was taken to monitor the situation and correct violations, and no effort made to record the actual time spent by employees on production work.[11] In other situations such evidence might be as consistent with careless as with willful conduct. In the situation here presented, with the means of monitoring and correction so easily available and given defendant's use of such techniques in order to routinize and control all other aspects of its operations, the inference is unavoidable that defendant deliberately chose to close its eyes to the violations it had every reason to believe would occur in order to avoid creating a record which would have made defense of this case impossible. Such a state of mind is equivalent to willfulness. *Barcellona v. Tiffany English Pub, Inc.*, 597 F.2d 464, 468–69 (5th Cir. 1979); *see United States v. Benjamin*, 328 F.2d 854, 861–62 (2d Cir. 1964).

■ The question has also been raised whether injunctive relief is necessary in the circumstances of this case since defendant has sold four of the five restaurants here at issue and since at present there appear to be no overtime violations at the fifth. The Court concludes that injunctive relief is, indeed, warranted, because of the likelihood that the situation occurring here will be repeated in the future at other locations owned by defendant unless restrained by this Court. The overtime violations which have occurred happened, as far as the proof here shows, not because of any peculiar

---

10. Defendant's job specifications for the Assistant Manager jobs provide that "actual involvement in production activities should be kept to a minimum (and certainly should not exceed 40% of work done)."

11. In fact, the evidence suggests that records of production work performed by Assistant Managers were kept for a period and then, lost or destroyed.

circumstances existing in the five restaurants which are involved on this lawsuit. On the contrary, the violations appear to have resulted from factors arising not at the store level, but higher in the corporate hierarchy, including the pressures created by defendant's nice calculations of the appropriate relationship to be maintained between staff and production. There is no reason to believe these will vary greatly from facility to facility. Moreover, the same factors, which persuade this Court that the defendant recognized the probability that violations of its express policies on its Assistant Managers' performing "hourly work" would occur and deliberately made certain that such violations would be difficult to detect, evince a likelihood that such violations will occur in the future in the absence of record-keeping devices and other measures designed to ensure that they will not. Accordingly, injunctive relief is appropriate not only to prohibit such violations in the future, but also to require defendant to prepare and put into operation a record-keeping system designed to record the time spent by Assistant Managers in production work.

Plaintiff is, accordingly, entitled to a judgment directing the payment of back pay at the time-and-one-half rate to the employees of defendant listed on exhibit A for each time period during which the employee earned less than $250 per week and worked in excess of forty hours and also, to injunctive relief prohibiting violations of the type here at issue with respect to its Assistant Managers in the future and directing the creation of a record-keeping system designed to record the time spent by its Assistant Managers on production work in order to deter such violations in the future. Plaintiff is directed to submit a form of judgment embodying the relief set forth above on five days' notice to defendant within ten days of the filing of this Memorandum Decision and Order.

The Clerk is directed to mail a copy of the within to all parties.

SO ORDERED.