**Donald H. STEIN, Plaintiff,**

v.

**J.C. PENNEY COMPANY, Defendant.**

**Civ. A. No. 80–2278–H.**

United States District Court,
W.D. Tennessee, W.D.

Feb. 16, 1983.

---

Jack F. Marlow, Memphis, Tenn., for plaintiff.

Etrula R. Trotter, Memphis, Tenn., Nelle M. Funderburk, Atlanta, Ga., for defendant.

## FINDINGS OF FACT, CONCLUSIONS OF LAW, ORDER

HORTON, District Judge.

This action was brought pursuant to provisions of the Fair Labor Standards Act, 29 U.S.C. §§ 201–219. Jurisdiction is conferred upon this Court by 28 U.S.C. § 1337 and § 16(b) of the Act. The case was tried without a jury, October 27 through November 1, 1982.

Plaintiff, Donald H. Stein, is a former employee of the defendant, J.C. Penney Company. Plaintiff contends that, although his job title and description fell within a classification that is exempt from overtime provisions of the Fair Labor Standards Act, his *actual* duties were of a nonexempt nature. Plaintiff thus claims that he is entitled to overtime pay for more than 800 hours and seeks a compensatory award for unpaid overtime pay, liquidated damages pursuant to a statutory double penalty provision (29 U.S.C. § 260), pre-judgment interest and attorneys fees. The Court finds that plaintiff's job was properly exempt from the overtime provisions of the Act and judgment should therefore be entered in favor of the defendant.

Plaintiff, 47, is well educated with both a college education and a law degree. After several years in the legal profession, plaintiff began a career in retail store management, first with Sears, Roebuck & Company and then with the J.C. Penney Company, the defendant in this lawsuit.

Plaintiff's association with the defendant began in 1971 when he joined the company's Treasury Division as a management trainee in Atlanta. He was soon transferred to the Memphis area where he served as operations manager of the Treasury store in Whitehaven until July of 1978. In that position he was involved in management responsibilities relating to scheduling, staffing, budget, payroll and other activities of an operational nature.

Plaintiff, after several years at the Whitehaven store, became interested in advancement to a store manager's position. He was advised that, since his primary experience to date had been in the operations area, it would be useful for him to work in a merchandising job before being considered for a position as store manager. Plaintiff requested a merchandising position and was transferred to the Treasury's North Hollywood store, also in Memphis, in July of 1978.[1] Plaintiff served as a senior merchandising manager at the North Hollywood store until he was dismissed in August of 1979. Within two weeks after his dismissal by defendant, plaintiff was hired

---

1. From an organizational standpoint, the position of senior merchandising manager is at a lower level than that of operations manager. However, the record indicates that plaintiff's base pay was the same in both positions. The testimony also indicated that the position of operations manager was being phased out at all the Treasury stores, and this factor may have played a role in plaintiff's transfer to the Hollywood store.

to his current position as manager of a Fred P. Gattas store in Memphis.

The focus of this lawsuit is plaintiff's job activities at defendant's Treasury store on North Hollywood. Plaintiff held his position at that store for just over one year, for which he received an annual salary of $18,940.

It is important to recognize that this is not an action for wrongful dismissal. The sole claim made by the plaintiff is that he was entitled to overtime pay for 817.75 hours worked in addition to the normal 40-hour work week while at the North Hollywood store. For defendant's failure to pay overtime, plaintiff seeks $11,163 in unpaid overtime compensation, an additional $11,163 in liquidated damages, plus interest and attorneys fees.

A brief review of the organizational structure of the North Hollywood Treasury store is helpful in understanding the nature of plaintiff's job and his role in the management of the store. At the top of the organizational chart is the store manager. This position was held by John Struthers during part of plaintiff's tenure at the store and then by Jamie Luter for approximately three months just before plaintiff was dismissed.

Below the store manager, the organization of the Treasury store essentially separates into two functional divisions, one headed by the operations manager[2] and the other directed by the general merchandising manager. It is, of course, the merchandising component of the store that is of importance in the case now under consideration.

The general merchandising manager of the Hollywood store, at all times pertinent to this lawsuit, was Michael Tognetti. Reporting to Mr. Tognetti were merchandise managers, senior merchandise managers and merchandiser trainees. The duties of the merchandising personnel who reported directly to Mr. Tognetti were similar in that each of these employees was involved in the presentation and buying of merchandise. However, as the title implies, the position of *senior* merchandising manager encompassed considerably more responsibilities than that of merchandising manager or merchandiser. Plaintiff's position required control over a larger number of departments, supervision of more employees and generally greater management duties than the other merchandising personnel.

Plaintiff was in charge of four departments out of the fourteen in the store. His departments included men's and boys', home entertainment, toys, and automotive. Plaintiff regularly had at least seven and sometimes as many as twelve employees reporting to him. This included full-time as well as part-time sales clerks and commission salesmen assigned to the four departments. In addition to his regular duties, plaintiff was in complete charge of the store two nights per week, alternating the night/Sunday management shift with two other managers.

Plaintiff's job description indicates that the position of senior merchandising manager entails considerable management activity. It involves developing merchandising plans, purchasing merchandise, determining merchandise presentation, meeting productivity objectives, providing personnel leadership, supervising sales and customer service in assigned areas and numerous other managerial functions.

In contrast to the job description, which emphasizes management activities which would be exempt under the Fair Labor Standards Act, plaintiff contends that his *actual* duties were primarily of a non-exempt nature. The plaintiff testified he spent 70–80 percent of his time on the sales floor, with the majority of his working hours spent on manual labor, including such tasks as returning shopping carts, packaging merchandise and running the cash register.

---

**2.** At some point the position of operations manager was phased out and the Treasury stores instituted a new position—vendor processing manager. However this change did not affect the organizational structure of the merchandising segment in which plaintiff was involved.

There is little doubt that the plaintiff did indeed perform more manual labor than one might expect from a reading of the job description. A former Treasury employee, Charlotte Swailles, supported plaintiff's estimate that he spent 70–80 percent of his time on the sales floor. And she agreed that it was not uncommon to see him changing displays, cleaning the fish tanks, stocking shelves or even sweeping the floor. However, the fact that the plaintiff did on occasion perform non-exempt work does not automatically make him a non-exempt employee. The Court must look not only at specific tasks plaintiff sometimes performed but also at the overall nature of the job. In determining the exempt or non-exempt status of plaintiff's position, and in assessing the validity of plaintiff's claims, the Court finds three specific factual elements of this case deserving of special attention.

First, the Court notes that the three Treasury stores in Memphis were all having financial difficulties during the 1978–79 year, and the North Hollywood store was a particularly troublesome problem for the defendant's Treasury Division. The North Hollywood store had the lowest sales volume of any of the Memphis stores and one of the lowest in the country. Not once did the North Hollywood store ever show an annual profit.

Because of the financial difficulties, the defendant was not able to staff the Hollywood store at optimum levels. This meant that employees were routinely shuffled among the various departments and called away from their normal assignments for brief periods to perform other tasks. For example, it was not uncommon for a sales clerk assigned to a specific department to be pulled away from her department and called to the front of the store to run a cash register during a peak period. However, despite these problems, the record indicates that staffing never fell below the minimum standards established by the Treasury Division for a store having the size and sales volume of the North Hollywood store. As one former merchandiser, Laurie Hogan Richardson, explained: "Nobody ever really had enough [help], but we made do."

The plaintiff obviously had more difficulty "making do" than the other managers. He constantly felt, and occasionally complained, that he was understaffed and had to do much of the physical work that non-exempt employees would normally be required to do. It is clear, however, that plaintiff's departments were no more understaffed than other parts of the store. It is equally clear that staffing, though far from ideal, was sufficient to adequately handle the essential operations of the store if the personnel were efficiently managed. The testimony indicated that plaintiff's successor, Ken Austin, was able to handle the job with the same personnel but without the same degree of difficulty demonstrated by the plaintiff.

The second factor that deserves attention is the personality and management style of plaintiff's immediate supervisor at the North Hollywood store, Michael Tognetti. Mr. Tognetti described himself as "very aggressive" and conceded that he had a temper and a tendency to occasionally speak harshly to his employees. Jamie Luter, the store manager during the last three months plaintiff was on the job, said Mr. Tognetti was the type of person "who wanted to get the job done." From the plaintiff's perspective, Mr. Tognetti not only wanted to get the job done, he always wanted it done "his way."

Plaintiff may have overreacted at times to Mr. Tognetti's demanding nature, and this may have indirectly contributed to plaintiff's feeling that he was being required to personally perform certain tasks rather than simply see that they were done. However, the Court finds that Mr. Tognetti's personality and management style were not such as to fundamentally affect the exempt nature of plaintiff's job.

The third factor deserving of special attention, and clearly the most significant of the three, is plaintiff's own management style. Although this is not a wrongful termination case, the reasons behind plaintiff's termination are relevant to the case. Ms.

Luter, who eventually dismissed the plaintiff, said she observed that he had a "very difficult time" organizing his priorities and delegating duties. Although Ms. Luter found the plaintiff to be generally dependable and prompt, he was quite unorganized, she said. He had difficulty recognizing problems and then using his own time and that of his employees to correct the problems. "He had a desire to do the work," Ms. Luter said, "but he couldn't set priorities."[3]

These sentiments were echoed by Mr. Tognetti who said plaintiff's chief problem boiled down to an "inability to delegate and prioritize." Mr. Tognetti said his own system of management was to categorize duties by importance from A to C. Using such a system to evaluate the plaintiff, Mr. Tognetti said plaintiff spent too much time "doing C's instead of A work," indicating that plaintiff spent an inordinate amount of time doing the less important jobs and tasks that could be delegated while failing to take care of duties related to the primary function of the position—management and supervision.

The following comment from Mr. Tognetti's deposition gives an insight into plaintiff's work performance.

I think Don had a problem with getting everybody in his staff to get the job functions done that he needed to get done. I think he found himself doing a lot of their work for them whereas all he had to do was assign them a particular task and ... sit down and plan it out for them and tell them how to do it, and in most cases I think that would have solved his problems.

Thus it is clear from the record that to the extent plaintiff did perform non-exempt duties it was largely a problem of his own creation. Plaintiff may have experienced some difficulties due to the financial situation of the Treasury stores, and Mr. Tognetti's aggressive manner may have had a minor impact on the nature of plaintiff's

job, but clearly the primary factor was plaintiff's inability to delegate, his failure to set priorities and an overall management style that was perhaps not suitable for the North Hollywood Treasury store.

The governing federal law in this area is found in the provisions of the Fair Labor Standards Act. Section 13(a)(1) of the Act, 29 U.S.C. § 213(a)(1), makes certain exemptions from the general requirements regarding minimum wage and overtime provisions found in 29 U.S.C. § 207. The pertinent language setting forth the exemptions states:

Exemptions

(a) The provisions of section 206 ... and section 207 of this title shall not apply with respect to—

(1) any employee employed in a bona fide executive, administrative, or professional capacity (including any employee employed in the capacity of academic administrative personnel or teacher in elementary or secondary schools), or in the capacity of outside salesman (as such terms are defined and delimited from time to time by regulations of the Secretary, subject to the provisions of the Administrative Procedure Act, except that an employee of a retail or service establishment shall not be excluded from the definition of employee employed in a bona fide executive or administrative capacity because of the number of hours in his workweek which he devotes to activities not directly or closely related to the performance of executive or administrative activities, if less than 40 per centum of his hours worked in the workweek are devoted to such activities);

29 U.S.C. § 213(a)(1).

The above section establishes a general exemption from the wage and hour laws for persons employed in a bona fide executive or administrative capacity. Regulations have also been adopted that are instructive

---

**3.** The Court finds Ms. Luter to be a highly credible witness. Her testimony was detailed, complete and convincing.

in making a determination of whether an employee is exempt under this section.

[A]n employee who is compensated on a salary basis at a rate of not less than $250 per week, . . . exclusive of board, lodging, or other facilities, and whose primary duty consists of the management of the enterprise in which the employee is employed or of a customarily recognized department or subdivision thereof, and includes the customary and regular direction of the work of two or more other employees therein shall be deemed to meet all requirements of this section.

29 C.F.R. § 541.1.

■ Plaintiff earned $18,940 annually, considerably more than $250 per week, making the quoted regulation applicable to a determination of plaintiff's exempt status. Therefore, the Court looks to (1) whether plaintiff's primary duty was management and (2) whether he regularly directed the work of two or more employees.[4]

There is no doubt that plaintiff regularly supervised two or more employees, so the fundamental question becomes whether plaintiff's "primary" duty was "management." The Code of Federal Regulations offers some assistance in evaluating exactly what is meant by the term "management":

(a) In the usual situation the determination of whether a particular kind of work is exempt or non-exempt in nature. is not difficult. In the vast majority of cases the bona fide executive employee performs managerial and supervisory functions which are easily recognized as within the scope of the exemption.

(b) For example, it is generally clear that work such as the following is exempt work when it is performed by an employee in the management of his department or the supervision of the employees under him: Interviewing, selecting and training of employees; setting and adjusting their rates of pay and hours of work; directing

their work; maintaining their production or sales records for use in supervision or control; appraising their productivity and efficiency for the purpose of recommending promotions or other changes in their status; handling their complaints and grievances and disciplining them when necessary; planning the work; determining the techniques to be used; apportioning the work among the workers; determining the type of materials, supplies, machinery or tools to be used or merchandise to be bought, stocked and sold; controlling the flow and distribution of materials or merchandise and supplies; providing for the safety of the men and the property.

29 C.F.R. § 541.102.

Defendant argues that the type of duties outlined in the above regulation is precisely the type of work plaintiff was hired to do. While it is conceded that plaintiff spent a great deal of time on the sales floor, this was necessary to carry out his duties, according to defendant. These duties included management of his departments, training and directing the work of other employees, appraising their productivity and efficiency, planning and apportioning work, determining what merchandise should be bought, etc. On the other hand, the plaintiff has argued that his actual work was of an entirely different nature than that portrayed by the defendant. Plaintiff testified he performed various housekeeping, stocking, unloading and other non-exempt duties.

The Court finds there is a certain amount of validity in both positions. Clearly plaintiff spent considerable time in management and supervisory roles and also at times became involved in some physical labor, which the Court has found was largely the result of his own inability to delegate duties. Thus, it is clear that plaintiff's job had some elements of both exempt and non-exempt work. The next obvious question then is whether plaintiff's management re-

---

**4.** This is known as the "short test," which establishes only two requirements in cases of employees earning at least $250 per week. In the case of employees earning more than $155 but less than $250 per week there is a "long test," which sets forth several requirements in addition to those found in the "short test." *See Donovan v. Burger King Corp.*, 672 F.2d 221, 223–24 (1st Cir.1982).

sponsibilities constituted his "primary duty" within the meaning of the regulations. The regulations are also helpful on this point:

A determination of whether an employee has management as his primary duty must be based on all the facts in a particular case. The amount of time spent in the performance of the managerial duties is a useful guide in determining whether management is the primary duty of an employee. In the ordinary case it may be taken as a good rule of thumb that primary duty means the major part, or over 50 percent, of the employee's time. Thus, an employee who spends over 50 percent of his time in management would have management as his primary duty. Time alone, however, is not the sole test, and in situations where the employee does not spend over 50 percent of his time in managerial duties, he might nevertheless have management as his primary duty if the other pertinent factors support such a conclusion. Some of these pertinent factors are the relative importance of the managerial duties as compared with other types of duties, the frequency with which the employee exercises discretionary powers, his relative freedom from supervision, and the relationship between his salary and the wages paid other employees for the kind of nonexempt work performed by the supervisor. For example, in some departments, or subdivisions of an establishment, an employee has broad responsibilities similar to those of the owner or manager of the establishment, but generally spends more than 50 percent of his time in production or sales work. While engaged in such work he supervises other employees, directs the work of warehouse and delivery men, approves advertising, orders merchandise, handles customer complaints, authorizes payment of bills, or performs other management duties as the day-to-day operations require. He will be considered to have management as his primary duty. In the data processing field an employee who directs the day-to-day activities of a single group of programers and who performs the more complex or responsible jobs in programing will be considered to have management as his primary duty. 29 C.F.R. § 541.103.

Generally the courts have not strictly applied the 50 percent guideline mentioned in the regulation but have instead taken the view that it is not the precise percentage of time involved in a particular type of work that is determinative but the overall nature of the job. *See, e.g., Donovan v. Burger King,* 672 F.2d 221 (1st Cir.1982); *Marshall v. Burger King,* 504 F.Supp. 404 (E.D.N.Y. 1980); *Harris v. Aetna Finance Co.,* 24 WH Cases 806 (N.D.Ga.1980).

For instance, in *Donovan,* the court noted that a strict 50 percent rule is difficult to apply where the management and non-management functions are not clearly severable. The court stated:

The regulation states that "[i]n the ordinary case it may be taken as a good rule of thumb that primary duty means the major part, or over 50 percent, of the employee's time." 29 C.F.R. § 541.103. There are two problems with this guideline. First, the more natural reading of "primary" is "principal" or "chief," not "over one-half." (Citation omitted). Second a strict time division is somewhat misleading here; one can still be "managing" if one is in charge, even while physically doing something else. The 50 percent rule seems better directed at situations where the employee's management and non-management functions are more clearly severable than they are here.

*Donovan, supra* at 226.

An employee can manage while performing other work, the *Donovan* court reasoned, and "this other work does not negate the conclusion that his primary duty is management." *Id.* The same rationale was used by the *Marshall* court, when it found "primary" to mean the "chief, principal or first of several functions." *Marshall, supra* at 409. In the case *sub judice,* plaintiff's chief or principal duty was management even though he performed some non-exempt work. And, as *Donovan* held, the fact that plaintiff performed some non-exempt

work does not negate the fact that primarily plaintiff was a manager.

Even if plaintiff spent more than 50 percent of his time doing non-exempt work rather than delegating the work to his employees, this does not automatically make him a non-exempt employee. In the *Harris* case, the court was faced with a set of facts not unlike those now before this Court. The court in *Harris* stated:

> The Court finds that although Plaintiff as ... office [manager] actually spent more than 50% of his time in routine non-exempt work, that his primary duty was nonetheless the management of the branch office. In this regard, the Court finds that Defendant actually empowered Plaintiff to utilize the bulk of his time supervising the office and managing its affairs. Although the Court credits the Plaintiff's testimony to the effect that he spent the majority of his time doing routine work, the Court finds that this was the result of Plaintiff's election, and was not because of any suggestion or requirement of Defendant. In this regard, the Court finds that the Plaintiff had the power and responsibility to apportion work within the office and that he did so.

*Harris, supra* at 808.

As in *Harris,* the plaintiff in this case may have spent an unusually large amount of time doing non-exempt work. But to the extent that is true, it was because of his own failure or inability to direct others. Generally, under any of the various court interpretations, plaintiff's primary duty was management. His failure to properly apportion the work, as was within his discretion to do, does not convert an exempt job into a non-exempt one.

Further, the regulations make it clear that time alone is "not the sole test." The regulations point out other pertinent factors such as:

> the relative importance of the managerial duties as compared with other types of duties, the frequency with which the employee exercises discretionary powers, his relative freedom from supervision and the wages paid other employees for the kind of non-exempt work performed by the supervisor.

29 C.F.R. § 541.103.

These factors, viewed in light of the testimony presented at trial, gives further support to the Court's conclusion that plaintiff's primary duty was management. Plaintiff exercised considerable discretion in his job and had limited supervision. In particular, the Court notes that the plaintiff earned roughly twice as much money as the "floor associates" who would normally be expected to do the majority of the non-exempt work. Obviously, it was not the intent of the defendant to pay plaintiff more than $18,000 per year to stock shelves and sweep the floor. A review of all the evidence brings the Court to the inescapable conclusion that plaintiff's primary duty was management.

The Court finds that plaintiff's position was properly classified by defendant as an exempt position and therefore was not controlled by the overtime provisions of the Fair Labor Standards Act. The Court finds in favor of the defendant.